1  **ZWILLINGER WULKAN, PLC**
2  Scott Zwillinger (019645)
   2020 North Central Avenue, Suite 675
3  Phoenix, AZ 85004
   Tele: (602) 962-5778
4  Facsimile: (602) 962-5778
5  Email: scott.zwillinger@zwfirm.com
   *Liaison Counsel for Plaintiff*
6
7  **LEVI & KORSINSKY, LLP**
   Adam M. Apton (pro hac vice forthcoming)
8  33 Whitehall Street, 17th Floor
   New York, NY 10004
9  Tel: (212) 363-7500
   Fax: (212) 363-7171
10 Email: aapton@zlk.com
11 *Counsel for Plaintiff*

12         **IN THE UNITED STATES DISTRICT COURT**

13             **FOR THE DISTRICT OF ARIZONA**

14 SINGH FAMILY REVOCABLE TRUST          No.
   U/A DTD 02/18/2019, Individually and
15 on Behalf of All Others Similarly       **COMPLAINT FOR VIOLATIONS**
   Situated,                               **OF THE FEDERAL SECURITIES**
16                                         **LAWS**
17                      Plaintiff,
                                           **CLASS ACTION**
18 v.
                                           DEMAND FOR JURY TRIAL
19 SPROUTS FARMERS MARKET, INC.,
   JACK L. SINCLAIR, and
20 CURTIS VALENTINE
21                      Defendants.
22

23         Plaintiff Singh Family Revocable Trust u/a dtd 02/18/2019 ("Plaintiff"),

24 individually and on behalf of all other persons similarly situated, by its undersigned

25 attorneys, alleges in this Complaint for violations of the federal securities laws (the

26 "Complaint") the following based upon knowledge with respect to its own acts, and upon

facts obtained through an investigation conducted by its counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Sprouts Farmers Market, Inc. ("Sprouts" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Sprouts' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Sprouts securities between June 4, 2025, and October 29, 2025, inclusive (the "Class Period"), including sellers of put options, seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.    Defendants provided investors with material information concerning Sprouts' growth potential for the fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's customer base to remain resilient to macroeconomic pressures and that Sprouts would instead benefit from the perceived tailwinds from a more cautious consumer.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Sprouts' growth potential; notably, that a more cautious consumer could result in significant slowdown in sales growth and the purported tailwinds with be unable to dampen the slowdown or would

otherwise fail to manifest entirely. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Sprouts' securities at artificially inflated prices.

4.      The truth emerged on October 29, 2025, when Sprouts announced disappointing top-line results for the third quarter of fiscal 2025 with comparable stores growth faltering below the Company's expectations.    Sprouts further announced disappointing fourth quarter guidance and further slashed its full year estimates, despite raising them only one quarter prior. The Company attributed its results and lowered guidance on "challenging year-on-year comparisons as well as signs of a softening consumer."

5.      Investors and analysts reacted immediately to Sprouts' revelation. The price of Sprouts' common stock declined dramatically. From a closing market price of $104.55 per share on October 29, 2025, Sprouts' stock price fell to $77.25 per share on October 30, 2025, a decline of about 26.11% in the span of just a single day.

## II. JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of itself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Sprouts is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff acquired Sprouts common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing its transaction(s) in Sprouts is attached hereto.

12.     Sprouts Farmers Market, Inc. is an Arizona corporation with its principal executive offices located at 5455 E. High Street, Suite 111, Phoenix, AZ 85054. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "SFM."

13.     Defendant Jack L. Sinclair ("Sinclair") was, at all relevant times, the Chief Executive Officer and Director of Sprouts.

14.     Defendant Curtis Valentine ("Valentine") was, at all relevant times, the Chief Financial Officer of Sprouts.

15.     Defendants Sinclair and Valentine are sometimes referred to herein as the "Individual Defendants." Sprouts together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sprouts' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material

1    non-public information available to them, each of these Individual Defendants knew that

2    the adverse facts specified herein had not been disclosed to, and were being concealed

3    from, the public, and that the positive representations which were being made were then

4    materially false and/or misleading. The Individual Defendants are liable for the false

5    statements pleaded herein, as those statements were each "group-published" information,

6    the result of the collective actions of the Individual Defendants.

7    17.    Sprouts is liable for the acts of the Individual Defendants, and its employees

8    under the doctrine of respondeat superior and common law principles of agency as all the

9    wrongful acts complained of herein were carried out within the scope of their employment

10    with authorization.

11    18.    The scienter of the Individual Defendants, and other employees and agents

12    of the Company are similarly imputed to Sprouts under respondeat superior and agency

13    principles.

14    ## SUBSTANTIVE ALLEGATIONS

15    *Company Background*

16    19.    Sprouts is a specialty grocery store chain that operates throughout the US,

17    with more than 450 stores across 24 states.

18    20.    The Company caters to more health-conscious shoppers with a focus on

19    fresh, natural, and organic goods, as well as plant-based, gluten-free, and other diet-specific

20    alternatives.

21    *The Defendants Materially Misled Investors Concerning*

22    *Sprouts' Ability to Withstand Macroeconomic Pressures*

23    June 4, 2025

24    21.    On June 4, 2025, Defendants presented at the 2025 dbAccess Global

25    Consumer Conference.  During the presentation, Defendant Sinclair differentiated Sprouts

26    from its competition when discussing the impact of "volatile consumer confidence,"

claiming their consumer base remains resilient regardless of the macroeconomic impact. In pertinent part, the following exchange occurred:

> <Q: Krizstina Katai – Deutsche Bank AG – Research Analyst> Great. And I just wanted to ask a more near-term oriented question. It looks like Sprout doesn't experience or experiences very little just from the volatile consumer confidence and the overall backdrop that we're experiencing in the U.S. Well, for example, yesterday, we heard about higher income household trade and accelerating from a dollar store? Could you speak to what you're seeing regarding your current consumer behavior? Have you seen any shifts over the last couple of weeks or even months as well?

> <A: Jack L Sinclair> Well, we're clearly watching this very closely because there's so much dialogue about consumer confidence and what's happening. And so you would have expected some things to have changed in our environment. The reality is we aren't seeing any change whatsoever, which is quite surprising even in the last few weeks.

> Now whether that will stay, we're kind of second guessing whether it will stay like that. And we're very clear that by region, by category, trading up, trading down, we're not really seeing a significant change in the pattern of what's happening in our business. And you would probably have expected it by now, Krisztina to have seen something in that. ***I think our customer base is a little bit more resilient to what's going on in the macro environment, I think you've got customers who are very health focused.***

> And if you're interested in your diet and you're a vegan, you've got to eat. You're probably going to stay eating the things that you're going to -- you're focused on in terms of our target customer. ***So I think that resilience comes and that gives us a lot of confidence going forward that irrespective of what happens in this pretty significantly uncertain time that we're going to be able to cope and deal with the changes as they come to us.***

22.    Defendant Valentine further suggested the cautious consumer creates a "tailwind," pertinently adding, "I think from a trade perspective, trade-in or trade down in that higher income consumer, I mean, one of those trades would be out of food away from home and into food at home, right, which actually creates maybe a little bit of a tailwind as that first wave of activity happens."

23.     Defendant Sinclair elaborated further on Sprouts' resilience to macroeconomic impacts, touting the Company's pricing and value proposition as differentiating factors during the following exchange:

<Q: Krisztina Katai> Right. So you have obviously embarked on the strategy shift, you've eliminated what you referred to as the coupon clippers that has resulted in a significant upgrade in household income. ***So do you think that your model post the strategy change just makes you may be less vulnerable to the overall macro and overall price intensity of food retail***. Then I wanted to touch on, if you think about your pricing perception of Sprouts in particular, key departments across the store?

<A: Jack L. Sinclair> Well, very specifically, as -- we're not -- I'll talk about pricing specifically. Produce pricing is very important to us. We spend a lot of time, it's the origins of the company, it's the DNA of the company, it's a bigger proportion of our business than anything else. So we spend a lot of time looking at produce pricing. ***We will have a very strong gap in organic product pricing, and we spend a lot of time analyzing where we need to be against conventional grocers and against Whole Foods as we look at our produce pricing.***

Other categories, we don't have the direct comparison. ***Increasingly, we've been getting ourselves in a place where the assortment that we're carrying is not -- does not appear in other places with the possible exception of Whole Foods across the rest of the marketplace, we're not really carrying the same things as the other people***.

And the way we look at pricing is about elasticity if we put a product out there that's got a fair value for the customer, and no one else to sell and that the customer will buy it. If they don't buy it, then maybe we've got the pricing wrong. So there's a lot of micro pricing work being done in our organization to try and understand exactly where that needs to play out.

***And by and large, that the focus of our value proposition is we're giving customers healthy products, differentiated products, innovative products and they will respond to that.*** And they've responded pretty well. And we don't see our price perception in the context of what is it against other grocers. We see it in the context of how does it work with our individual customers, and that's the context of our pricing decisions.

It's taken me a little while to get my mind around that as having been a grocer for 100 years in every other place. The context of thinking about this in a different way, reflects that we really love being different as a company and thinking that through is how we navigate our way to thinking about our price perception.

(Emphasis added).

*July 30, 2025*

24.    On July 30, 2025, Sprouts published its second quarter fiscal 2025 results, in pertinent part, as follows.

**Second Quarter Highlights:**

- **Net sales** totaled $2.2 billion; a 17% increase from the same period in 2024
- **Comparable store sales** growth of 10.2%
- **Diluted earnings per share** of $1.35; compared to diluted earnings per share of $0.94 in the same period in 2024
- **Opened 12 new stores**, resulting in **455 stores in 24 states** as of June 29, 2025

25.    Defendants additionally published updated guidance, significantly increasing their full year outlook while forecasting a strong third quarter.  In pertinent part, the release provided the following:

**Third Quarter and Full-Year 2025 Outlook**

The following provides information on our third quarter 2025 outlook:

- **Comparable store sales growth:** 6.0% to 8.0%
- **Diluted earnings per share:** $1.12 to $1.16

The following provides information on our full-year 2025 outlook:

- **Net sales growth:** 14.5% to 16.0%

- **Comparable store sales growth:** 7.5% to 9.0%

- **EBIT:** $675 million to $690 million

- **Diluted earnings per share:** $5.20 to $5.32

- **Unit growth:** At least 35 new stores

- Capital expenditures (net of landlord reimbursements): $230 million to $250 million

26.     During the same-day earnings call, Defendant Valentine detailed the Company's elevated guidance further, stating, in pertinent part:

> ***For 2025, we expect total sales growth to be 14.5% to 16% and comp sales in the range of 7.5% to 9%.*** We still anticipate comp sales to moderate as we cycle the higher comps from late 2024. We plan to open at least 35 new stores. Earnings before interest and taxes are expected to be between $675 million and $690 million, and earnings per share are expected to be between $5.20 and $5.32, assuming no additional share repurchases. That said, we do expect to continue to repurchase shares opportunistically. We also expect our corporate tax rate to be approximately 24%. During the year, we expect capital expenditures net of landlord reimbursements to be between $230 million and $250 million. For the third quarter, we expect comp sales to be in the range of 6% to 8% and earnings per share to be between $1.12 and $1.16.
>
> ***As we have begun to lap last year's comp step changes, we continue to see consistent 2-year stack performance of approximately 15%.*** In the second quarter, we also benefited from some external tailwinds that pushed the 2-year stack above our run rate in May and June. ***While those tailwinds come and go, the approximately 15% 2-year stack remains consistent and gives us confidence in our increased comp guidance***.

(Emphasis added).

27.     For comparison, Defendant Valentine previously provided Sprouts fiscal 2025 outlook during the Company's first quarter fiscal 2025 earnings call on April 30, 2025, stating the company had expected "total sales growth to be 12% to 14% and comp sales in the range of 5.5% to 7.5%."

28.    Defendant Sinclair touted the Company's recent performance and expressed confidence in their ability to meet the updated financial metrics, stating, in pertinent part:

> ***Currently, we are seeing strong customer acquisition and an increase in share of wallet***. Our customer experience is improving across all channels. In-store performance has strengthened due to better in-stocks, fresher products and superior service. Additionally, our e-commerce platform continues to grow with shop.sprouts.com experiencing the fastest increase in penetration.
>
> . . .
>
> ***As we look ahead, we remain confident in our strategic direction and Sprouts unique position within the specialty food retail landscape***. Our journey is not just about growing stores or improving margins, it's about deepening our connection with customers who seek real food, fresh quality ingredients and innovative products that meet their unique needs. We've been making progress, but we know there's much more to do, whether it's expanding our footprint, strengthening our supply chain or continuing to innovate. We're committed to building a resilient, purpose-driven company that delivers long-term value to our shareholders and positively impact the communities we serve.

(Emphasis added).

29.    A question-and-answer segment followed, during which defendants elaborated further on the increase to the Company's guidance during the following pertinent exchanges:

> <Q: Edward Joseph Kelly – Wells Fargo Securities, LLC – Senior Analyst> Nice quarter. I wanted to ask you about the comp and the cadence and momentum. So you talked about a stable sort of 15%-ish 2-year before May and June acceleration. So I was hoping you could speak to that acceleration. Curious if it was related to the disruption across the industry with UNFI. And then I'm curious what you've seen so far in July. And that kind of dovetails into guidance because the guidance for 6% to 8% in Q3, 6% is 15%, right? So you've guided the midpoint a little bit better than that. I'm just kind of curious about sustainability of current trend and how you were thinking about it all with guidance.
>
> <A: Curtis Valentine> Sure. Thanks, Edward. This is Curtis. Yes, ***2 things really in May and June. Really, the biggest driver was we had a really strong produce season. So we've seen some really good organic crops and***

*availability*. And so the team, again, has done a great job. We're well positioned. They work really closely with the growers. We're focused on local. They're focused on organic first. And so when we have a good season, particularly in organic, they're able to capitalize on it. And that's what we really saw through May and June. As the seasons evolve, that's kind of normalized a bit. But in May and June, we saw a nice pop in the produce business.

And then ***the second piece, sure, there was quite a significant disruption in the natural organic space. And we had a limited impact there just because we have a smaller portion of our business there***. And so that was a helper, too. We had some people come our way when they couldn't find things elsewhere, and that also boosted them. That's a little bit more of the June. But the May, June story in total was a little bit better than that 15%.

***And then as far as how that's evolved quarter-to-date, both of those things have kind of settled and normalized a bit. And so we're kind of back into that 15% 2-year stack run rate. And really, quarter-to-date through July, it's right at the midpoint from a 2-year stack perspective***. And so that's what gives us the confidence in the guide. It's been -- ***since we jumped up last September, 7 of the 11 periods have been in that 15% range with just a few periods where we've seen some external factors that we've capitalized and seen stronger numbers***. And so just the consistency of what we've seen, I think, gives us the confidence to guide where we guided.

. . .

<Q: Scott Andrew Mushkin – R5 Capital LLC – Founder, Managing Partner, CEO & Director of Research> So my first one, and it's just about the fourth quarter. Thinking about, Curtis, what you said about kind of a 15% to 16%, I guess, stacked comp, that implies a pretty low comp for the fourth quarter. And I was just -- stacks are good until they're not good. And I was just wondering how you guys are thinking about the fourth quarter. I mean it seems like as the business is running right now, a 4% comp, even though it would get you stack in the same place, just doesn't seem realistic.

<A: Curtis Valentine> Yes. I think, Scott, I think what we'll be watching, we've talked kind of for the year, the 3 big things, right, ***as we comp the comp, 2 big step changes last year, and we've cycled through the first one in May. The next big one is in September. And so we'll get a read on kind of your question,*** could it be a little better in the fourth quarter from a 2-

year stack perspective. We'll have that answer when we get through September here later this quarter.

The second piece was the new stores and particularly the comp impact from the [ 24 ] vintage. I think about 1/4 of the [ 24 ] vintage stores are now in the comp base. So that's still largely ahead of us. And then loyalty, loyalty will be some upside. If it takes off a little bit quicker than we think or has a bigger impact early than we think it might. That's a piece that we've been watching as well, but is largely in front of us. ***And so I think we still have some questions to answer there. And certainly, we're going to go try to drive it higher and hope that it will be better. But for now, I think it's prudent to kind of stick to the 15% that we've been seeing pretty consistently for several months now.***

(Emphasis added).

30.     Defendants also discussed potential impacts from macroeconomic issues, again touting their consumer base's resilience to softening, during the following pertinent exchange:

<Q: Rupesh Dhinoj Parikh – Oppenheimer & Co., Inc. – MD & Senior Analyst> I'll just kick it off with 2 macro questions. So just on inflation, just curious what you guys are seeing in the business and expectations going forward. And then on the consumer front, your business continues to perform quite well. Just curious if you're seeing any changes in dynamics around the consumer.

<A: Curtis Valentine> On the inflation front, it's been pretty consistent from quarter-to-quarter. So we're seeing a similar -- we're tracking CPI in line with the way we typically do. Obviously, our fresh business is a little more volatile, but, it's tracking in line with that. And then we've got some kind of mix helpers as we move to organic and we work some of the value pack type things. So similar story to Q1 on the inflation and AUR front.

<A: Jack L. Sinclair> And in terms of the customer side of things, what we're seeing, ***our customer seems to be being pretty resilient***. There's still a lot of uncertainty going forward that we're not quite sure about. But if we look at the numbers and we look at how our customers are ***reacting, I think we've always said that our customer base is pretty focused on what they eat and how they eat*** and how they -- ***so I think we've got some resilience***

***almost irrespective of what happens in the macro economy***. I think there's some uncertainty going forward. We're not seeing a lot of dynamics in the other grocery retailers in terms of changing things too much. And ***our business has proven pretty resilient, as you can see from the numbers.***

. . .

<Q: Mark David Carden – UBS Investment Bank – Associate Director and Associate Analyst> … we've seen restaurant traffic continue to decline over the past 3 months, a bit more moderate pace versus earlier in the year. ***I know in the past, you guys have talked about some potential trade-in from food away from home. Do you believe you're seeing any more of a tailwind there?*** And are you seeing any lifts in your prepared food sales?

<A: Jack L. Sinclair> We're working very hard in prepared foods. We've got a new salad program out there, a new meals program out there. So we're working hard at it. And the team are putting some really -- the deli team are doing some really good work in that space. ***I'm encouraged by that, and it might be helping us a little bit as you go through that going forward***. It's something that we'll continue to invest in.

(Emphasis added).

31.      The above statements in Paragraphs 21 to 30 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's resilience against macroeconomic pressures, its ability to lap its prior comparables and its overall projected revenue outlook and anticipated growth while also minimizing ongoing risks potentially triggered by reduced spend from a more cautious consumer. In truth, Sprouts' optimistic reports of growth and stability in the face of macroeconomic instability fell short of reality; the Company's consumer base was not as resilient to macroeconomic pressures as Defendants contended and ultimately reduced spend, the perceived tailwinds from such pressures failed to manifest, and Sprouts'

ability to lap its prior comparables was well overstated, ultimately resulting in the

Company being unable to meet its lofty growth projections.

***The Truth Emerges during Sprouts' Third Quarter Earnings Report***

<u>*October 29, 2025*</u>

32.    On October 29, 2025, Defendants released their third quarter, fiscal 2025

results.  The results disappointed Sprouts' comparable stores sales growth faltering below

both market expectations and Sprouts' own prior guidance and triggering a reduction in

the Company's projections.  In pertinent part, the release provided the following:

**Third Quarter Highlights:**

- **Net sales** totaled $2.2 billion; a 13% increase from the same period in 2024
- **Comparable store sales** growth of 5.9%
- **Diluted earnings per share** of $1.22; compared to diluted earnings per share of $0.91 in the same period in 2024
- **Opened 9 new stores**, resulting in **464 stores in 24 states** as of September 28, 2025

. . .

**Fourth Quarter and Full-Year 2025 Outlook**

The following provides information on our fourth quarter 2025 outlook:
- **Comparable store sales growth:** 0.0% to 2.0%
- **Diluted earnings per share:** $0.86 to $0.90

The following provides information on our full-year 2025 outlook:
- **Net sales growth:** approximately 14%
- **Comparable store sales growth:** approximately 7.0%
- **EBIT:** $675 million to $680 million
- **Diluted earnings per share:** $5.24 to $5.28
- **Unit growth:** 37 new stores
- **Capital expenditures (net of landlord reimbursements):** $230 million to $250 million

33.    During the same-day earnings call, Defendant Sinclair commented on the Company's quarterly performance, stating, in pertinent part:

> In the third quarter, we delivered strong earnings growth, up 34% year-on-year with a 5.9% comp and strong new store performance. Our results continue to be driven by our execution on the key pillars of our strategy. We saw an increase in customer traffic as we effectively engaged with our target customers, while our most differentiated and attribute-based products continued to drive sales as we continue to expand our store presence
>
> . . .
>
> While it was a solid third quarter, ***it fell short of our top line expectations***. As the quarter progressed, ***our comp sales moderated faster than expected as we came up against challenging year-on-year comparisons as well as signs of a softening consumer***.

(Emphasis added).

34.    Defendant Valentine then provided the financial details for the third quarter's performance, in pertinent part, as follows:

> In the third quarter, total sales were $2.2 billion, up $255 million or 13% compared to the same period last year. ***This growth was driven by a 5.9% increase in comparable store sales and the strong results from new stores***. Traffic remained positive and accounted for approximately 40% of our third quarter comp.
>
> . . .
>
> While our third quarter yielded solid results, ***we expected more from our top line as we underestimated the impact of lapping strong numbers from last year in the context of a softening consumer backdrop***. We believe our strategy always has us well-positioned to capitalize on the surging interest in health and wellness.

(Emphasis added).

35.    Defendant Valentine also detailed the Company's below-expectation fourth quarter guidance and announced that Sprouts' full-year guidance, which had been elevated only the prior quarter, would be significantly cut back, stating, in pertinent part:

As we look ahead for the remainder of this year, ***we are balancing the strength of our business strategy against the consumer uncertainty and challenging year-over-year comp compares. For the full year, we expect total sales growth to be approximately 14% and comp sales to be approximately 7%.*** Given the strong execution of our real estate pipeline and fewer time line delays, we now plan to open 37 new stores in 2025.

Earnings before interest and taxes are expected to be between $675 million and $680 million, and earnings per share are expected to be between $5.24 and $5.28, assuming no additional share repurchases. That said, we expect to continue repurchasing shares opportunistically. We also expect our corporate tax rate to be approximately 24% -- during the year, we expect capital expenditures, net of landlord reimbursements, to be between $230 million and $250 million.

***For the fourth quarter, we expect comp sales to be in the range of 0% to 2% and earnings per share to be between $0.86 and $0.90***. In the fourth quarter, year-over-year margin rate in both gross margin and SG&A are normalizing. Despite pressure to our top line, we expect to be able to grow EBIT dollars in line with our sales growth to deliver stable year-over-year margins in the fourth quarter.

Despite facing challenging revenue comparisons, we remain confident that we have a resilient business capable of delivering solid earnings growth.

(Emphasis added).

36.    A question-and-answer segment again followed the Defendants prepared remarks, during which Defendants fielded multiple questions related to Sprouts' growth setbacks, denying impact from competition and clarifying such setbacks are directly related to slowdowns in consumer spending during the following pertinent exchanges:

<Q: Michael David Montani – Evercore ISI Institutional Equities – Managing Director> I just wanted to ask, we've had some questions about concerns around competition that might be potentially encroaching on your core consumer. I just wanted to see kind of how you would respond to that, if there was other cyclical temporal headwinds that we should be thinking about in the quarter and then how that could play out in the fourth quarter?

1    And also, do you see this as a function of competition? Or is it something
2    else?

3    <A: Jack L. Sinclair> Well, I think what we talked about in the script there,
     Mike, was very much there's -- *we're lapping some tough numbers from*
4    *last year. And at the same time, there's a kind of consumer context that*
     *feels like things are getting a little bit more difficult for the consumer*. So
5    putting that into context, we always look at what our competitors are also
6    doing and what the competitors are playing in there. But our strategy is
     pretty clear. We've got 7,500 new innovative products launched. I don't
7    think -- I haven't seen anyone else launching that kind of number of
     innovation and differentiation.
8

9  . . .

10   <Q: Seth Ian Sigman – Barclays Bank PLC – Research Analyst> There's a
11   concern in the market that there have been some unique drivers helping
     your business over the last 12 months. You've had great performance and
12   the concern is that those drivers are going away. As you reflect on that and
13   the current slowdown that you're seeing, is there anything you would call
     out that's proving more difficult to lap?
14

15   And then you talked about keeping your customers. You grew your
     customers quite a bit last year. I mean, how are you seeing that play out?
16   Are we seeing perhaps a change in spending behavior, lower spend per
17   customer?

18   <A: Curtis Valentine> Hi Seth, this is Curtis. We've just seen some pockets
     and windows where we've had some outsized growth and gains. We've
19   talked about those on the call. Certainly, last October was our strongest
20   month that we've compared against. It was a 13-and-change comp.
     February, we had some help from a strike at a competitor that was upside.
21   And then May and June, we had strong months with a good customer
     season from produce and some challenges in the industry from a supply and
22   a cyber issue. We saw customers come our way in those moments. We're
23   always well positioned to kind of capitalize in those moments.

24   But we don't see anything structural in -- outside of those types of things
25   that we're up against. But we do have those moments that we'll be up
     against over the course of the next 10 months. And then just, yes, a little bit
26   of softness in our business. I mean we see things in more of our middle-
     income trade areas, some of our younger trade areas where we see those

demographics, we've seen the business soften just a little bit more than the rest of the business. And those are the things that we're kind of pointing to as it relates to the customer pressure.

. . .

<Q: Leah Dianne Jordan – Goldman Sachs Group, Inc. – Research Analyst> I'll kind of stick with the same theme around the comp slowdown. Just seeing if you could provide some more detail on the key surprises versus your expectations because this was a notable miss, right, below even your guide. Has there been any major difference across the regions or product categories?

And I think ultimately, you've historically talked about your offering being resilient to macro pressures as people are committed to their diets. But now you're talking about a softer consumer. So I think ultimately, has something shifted around your value proposition today? How do you view it? And I guess, why don't you see the need to invest a bit more to reengage your core consumer as you're really implying market share losses in the fourth quarter?

<A: Jack L. Sinclair> Well, I think the first thing we'd say is we're lapping some tough numbers from last year, and *we may have underestimated the challenge of lapping those numbers*. And it happened through the quarter as opposed to in the quarter. *And as we look forward, we're anticipating a challenging environment. We know what we've got to lap going forward, and we're anticipating a little bit of pressure on the consumer going forward.*

The health and wellness macro trends are still strong for us, and we see a real opportunity in doubling down on the loyalty program behind that going forward. And there are some macro pressures that I think you'll see coming through in the marketplace that we are certainly experiencing.

With regard to thinking about what should we do with -- we're not seeing a competitive dynamic changing dramatically in the marketplace in terms of pricing or activity. We've always promoted and we're very comfortable with promoting going forward. And we'll do what we need to do, but we're very strong in terms of managing our margins, managing our costs, and we'll consistently do that. You can see that from the numbers that we've just produced and the numbers that we will produce going forward. So no, we're not seeing anything dramatic in terms of the competitive dynamic in this

space. We are seeing consumers under a bit of pressure, and we'll have to react to that in some ways, and we are reacting to that in the appropriate way.

<A: Curtis Valentine> And then to the miss in Q3, Leah, yes, ***I think we sailed through that first step change in the comp in May and June and didn't really see the underlying pressure again,*** probably masked a little bit of what was starting to go on there. But it was really the end of Q3, as Jack mentioned, where it really started to drop off a bit, and that's when we get up against the 10-plus comps here in September and then 13-plus in October. And so being a little bit cautious with where we are and looking ahead as we go up against the 10.5% and 10.5% roughly in November and December.

(Emphasis added).

37.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the June 4, 2025, and July 30, 2025, shareholder calls. On those calls, Defendants continually praised its consumer base's resilience to macroeconomic pressures, touted tailwind benefits of such pressures, and confidently claimed the ability to lap difficult step-up comparisons from the prior year's results to continue its projected growth trajectory, which was elevated during the July 30, 2025 call, all the while management continually minimized risks associated with competition, macroeconomic instability, and general consumer slowdowns impacting the Company's growth potential.

38.    Investors and analysts reacted immediately to Sprouts' revelation. The price of Sprouts' common stock declined dramatically. From a closing market price of $104.55 per share on October 29, 2025, Sprouts' stock price fell to $77.25 per share on October 30, 2025, a decline of about 26.11% in the span of just a single day.

39.    A number of well-known analysts who had been following Sprouts lowered their price targets in response to Sprouts' disclosures. For example, Barclays, while lowering their price target 34%, highlighted that "SFM stock is in a difficult spot with growth slowing more than expected, difficult comparisons still ahead, near-term consumer uncertainty, and competitive questions that can linger based on where comps are." The analyst further commented that "Comps below expectations at +5.9% (guidance 6-8%, expectations were still 7%+) moderated faster than expected against difficult comparisons along with signs of softening consumer."

40.    Roth, while similarly reducing its price target, also noted that "the [comp] deceleration was quicker than expected" as "Sprouts is facing more difficult prior-year comparisons, but also a softening consumer environment." And further noted that they "believe increased competition is a factor."

41.    CFRA's analyst likewise highlighted they "believe the comp sales softness reflects tough Y/Y comparisons and a weakening consumer backdrop." However, the analyst also noted that they were "surprised by the big deceleration in comp sales this quarter and question whether the competitive dynamics are changing in the natural and better-for-you grocery space."

42.    The fact that these analysts, and others, discussed Sprouts' shortfall, reduced guidance, and below-expectation projections suggests the public placed significant weight on Sprouts' prior claims of macroeconomic resilience as well as the Company's previously elevated revenue and comparable growth estimates. The frequent, in-depth discussion of

Sprouts' guidance and its predicated justifications confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

43.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sprouts' common stock and operated as a fraud or deceit on Class Period purchasers of Sprouts' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Sprouts' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Sprouts' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

44.     Sprouts' stock price fell in response to the corrective event on October 29, 2025, as alleged *supra*. On October 29, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Sprouts' expected macroeconomic impact, forecasting processes, and growth guidance.

45.     In particular, on October 29, 2025, Sprouts announced disappointing top-line results and comparable store growth rates well below market and internal Company expectations, triggering a below-market fourth quarter guide and a quick reversal on Sprouts' projections for the full fiscal year.

### *Presumption of Reliance; Fraud-On-The-Market*

46.     At all relevant times, the market for Sprouts' common stock was an efficient market for the following reasons, among others:

(a)     Sprouts' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Sprouts communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Sprouts was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Sprouts was reflected in and incorporated into the Company's stock price during the Class Period.

47.    As a result of the foregoing, the market for Sprouts' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Sprouts' stock price. Under these circumstances, all purchasers of Sprouts' common stock during the Class Period suffered similar injury through their purchase of Sprouts' common stock at artificially inflated prices, and a presumption of reliance applies.

48.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from

the fact that they provided investors with growth expectations while at the same time failing to maintain adequate forecasting processes as Defendants confidently disregarded and downplayed potential macroeconomic impacts. Defendants provided the public with claims of continued resilience and subsequent forecasts that failed to account for this slowdown in growth and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

50.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

51.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Sprouts who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sprouts' securities during the Class Period, including sellers of put

options (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

53.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sprouts' common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sprouts or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 27, 2025, there were 97.37 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

54.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sprouts;

(c)    whether the Individual Defendants caused Sprouts to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Sprouts' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

58.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprouts common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Sprouts' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sprouts' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

62.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available

1  to Defendants. Said acts and omissions of defendants were committed willfully or with
2  reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded
3  that material facts were being misrepresented or omitted as described above.

4          63.    Information showing that Defendants acted knowingly or with reckless
5  disregard for the truth is peculiarly within defendants' knowledge and control. As the
6  senior managers and/or directors of the Company, the Individual Defendants had
7  knowledge of the details of Sprouts' internal affairs.

8          64.    The Individual Defendants are liable both directly and indirectly for the
9  wrongs complained of herein. Because of their positions of control and authority, the
10  Individual Defendants were able to and did, directly or indirectly, control the content of
11  the statements of the Company. As officers and/or directors of a publicly-held company,
12  the Individual Defendants had a duty to disseminate timely, accurate, and truthful
13  information with respect to Sprouts' businesses, operations, future financial condition and
14  future prospects. As a result of the dissemination of the aforementioned false and
15  misleading reports, releases and public statements, the market price of Sprouts' common
16  stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts
17  concerning the Company which were concealed by Defendants, Plaintiff and the other
18  members of the Class purchased or otherwise acquired Sprouts' common stock at
19  artificially inflated prices and relied upon the price of the common stock, the integrity of
20  the market for the common stock and/or upon statements disseminated by Defendants, and
21  were damaged thereby.

22          65.    During the Class Period, Sprouts' common stock was traded on an active and
23  efficient market. Plaintiff and the other members of the Class, relying on the materially
24  false and misleading statements described herein, which the defendants made, issued or
25  caused to be disseminated, or relying upon the integrity of the market, purchased or
26  otherwise acquired shares of Sprouts' common stock at prices artificially inflated by

defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sprouts' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Sprouts' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

68.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Sprouts' misstatements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Sprouts which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sprouts disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sprouts to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sprouts' common stock.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Sprouts to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants and/or Sprouts are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 24th day of November, 2025.

**ZWILLINGER WULKAN PLC**

By:  */s/ Scott Zwillinger*
Scott Zwillinger
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
*Liaison Counsel for Lead Plaintiff and the Class*

**LEVI & KORSINSKY LLP**

By:  */s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Lead Counsel for Lead Plaintiff and the
Class*